UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  24-14017-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA

v.

JOSEPH CHRISTOPHER COPELAND,

Defendant.

_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANT'S
SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE**

The United States of America, by and through the undersigned Assistant United States Attorney, hereby responds in opposition to the defendant's sentencing memorandum and motion for downward variance, based on the use of the guidelines related to "Ice," and moves this Honorable Court to impose a sentence of 328 months, followed by a term of lifetime supervised release.

**BACKGROUND**

On March 28, 2024, law enforcement officers with the Department of Homeland Security, Homeland Security Investigations (HSI) and the Highlands County Sheriff's Office (HCSO) executed a federal search warrant (24-MJ-031-SMM) at the defendant's residence in Sebring, Highlands County, Florida, after witnessing a Honda minivan suspected to contain illegal drugs arrive at the residence and enter the garage (PSI ¶ 7).  Shortly after the vehicle arrived, a Mazda SUV also arrived at the defendant's residence, parked in the driveway, and two occupants entered the residence (PSI ¶ 6).  Several hours later, the occupants returned to the Mazda and left (id.).

HSI and HCSO executed a search warrant on the residence, which was the defendant's registered address with the Florida Department of Highway Safety and Motor Vehicles, the defendant's registered vehicle was parked in the driveway, and the defendant and his wife were present at the residence at the time of the search (PSI ¶ 7).

In one of the bedrooms, agents located seven large packages of blue pills, and three large plastic bags containing a white substance in a dresser (PSI ¶ 8). The blue pills field tested positive for fentanyl, and the white substance field tested positive for methamphetamine (id.). In the same dresser, agents found financial cards and documents with the defendant's name, along with a .380 caliber Colt pistol, a GSG .22 caliber pistol, and approximately 17 rounds of ammunition (id.). The GSG pistol was on top of a bag that contained methamphetamine, and the Colt was underneath the same bag (id.). The bedroom also contained a digital scale and many prescription pill bottles with the defendant's name on them (PSI ¶ 10).

Agents also located a Honda minivan in the garage of the residence with two hidden metal compartments, which did not appear to be factory-made, located on the bottom of the vehicle, behind the wheel wells (PSI ¶ 9). There, agents found five more packages of blue pills, that matched the packages found in the residence inside the compartments (id.).

Separately, HCSO deputies conducted a traffic stop on the aforementioned Mazda (PSI ¶ 6). During the stop, a narcotics detection K9 alerted to the presence of drugs, and deputies found both methamphetamine and fentanyl inside the vehicle. One occupant admitted, post-*Miranda*, that he/she knew the defendant "Dump" for about a year, from whom he/she purchases methamphetamine for $300 per ounce (id.). The occupant went on to explain that the defendant is the "big dog" of the area, referring to drug distribution. In the past, the defendant also asked the occupant to move fentanyl pills for him, but the occupant refused. The occupant also said that the

2

defendant showed him/her a pistol that he kept in his bedroom, along with what looked like methamphetamine in the master bedroom drawer, and a van that the defendant claimed contained 80,000 fentanyl pills (id.).

The second occupant of the Mazda also gave a post-*Miranda* statement, and explained that the first occupant was waiting for a call from "Dump" (the defendant) on March 27, 2024, to help unload pills from a car, in exchange for some of the pills (PSI ¶ 6). He/she also admitted that the first occupant buys 100 pills from the defendant, two or three times a week for $6 per pill, and resells them (id.). While at the defendant's house, the defendant asked the first occupant to help unload a car containing pills, then the first occupant and the defendant went into the garage, and the defendant returned carrying five or six lunch style paper bags (id.).

The suspected methamphetamine and fentanyl found in the residence was sent to the DEA Laboratory in Miami (PSI ¶ 9). The suspected methamphetamine tested positive for methamphetamine hydrochloride, with a "pure" weight of 111.6 grams; and the suspected fentanyl tested positive, with a chemistry weight of 8.9929 kilograms, according to expert forensic chemists (id.).

On April 25, 2024, a federal grand jury, sitting in Fort Pierce, in the Southern District of Florida returned an Indictment charging Joseph Christopher Copeland (the defendant) with two counts of possession with intent to distribute a controlled substance, one count of possession of a firearm in furtherance of a drug trafficking offense, and one count of possession of a firearm by a convicted felon (ECF No. 18).

On July 24, 2024, the United States filed a superseding information, alleging a section 851 enhancement for counts one and two (ECF No. 34).

On July 29, 2024, the defendant pled guilty to possession with intent to distribute a controlled substance, as alleged in counts one and two of the superseding information, pursuant to a written plea agreement with the United States (ECF Nos. 37-39).

On September 12, 2024, the United States filed its objections to the PSI (ECF No. 46), and on September 26, 2024, the defendant filed his response to the objections (ECF No. 49).  Then, on October 3, 2024, the defendant filed objections to the PSI (ECF No. 50), and on October 15, 2024, the United States filed its response to the objections (ECF No. 51).

On October 31, 2024, the defendant filed a motion for downward variance

The defendant's sentencing hearing is scheduled for November 7, 2024 (ECF No. 48).

For the reasons that follow, the United States submits that a variance is not warranted, either on the grounds of an alleged sentencing disparity, nor the defendant's substantive conduct and personal circumstances.  Instead, the United States moves this Court to impose a sentence of 328 months, followed by lifetime supervised release.

## ARGUMENT

**A. Departure is not warranted pursuant to § 5H1.4, as the defendant failed to establish that his physical condition is "extraordinary" by a preponderance of the evidence.**

A defendant seeking a downward departure bears the burden of proof to establish, by a preponderance of the evidence, that he is entitled to a downward departure.  *United States v. Onofre-Segarra*, 126 F.3d 1308, 1310 (11th Cir. 1997) *citing United States v. Miller*, 78 F.3d 507, 511-12 (11th Cir. 1996).

To establish that a specific offender characteristic merits a guideline departure, the defendant must show that the characteristic is extraordinary, and justifies the departure, as "section 5H1.1-6 prohibit[s] departures from the applicable sentence range in all but extraordinary cases."

*United States v. Mogel*, 956 F.2d 1555, 1562 (11th Cir. 1992). The *Mogel* Court acknowledged the existence of the relevant policy statements of section 5H1.1-6, but concluded that "none of the policy statements of that section explicitly authorizes departure from the guideline range on the basis of offender characteristics." *Mogel*, at 1561-62.

Here the defendant argues that "he suffers from severe health issues, including hypothyroidism, type II diabetes, cellulitis, arthritis, and a history of atrial fibrillation." (ECF No. 53). While the government sympathizes with the defendant's medical condition, the mere existence of a medical condition fails to establish by a preponderance of the evidence, that the defendant's physical condition is "extraordinary" within the meaning of the law.

As noted in the presentence investigation report, the defendant's conditions were supported by Wellpath medical records; however, his records also confirm that he receives treatment for these conditions, was issued compression socks for swelling, and was issued a lower bunk (PSI ¶ 49). The defendant's treatments are known, established, and in line with similarly situated patients receiving medical treatment.

As such, the Bureau of Prisons is adequately equipped to provide for the defendant's care, and nothing about his treatment rises to the level of extraordinary. *See United States v. Sanchez*, 381 Fed.App'x 917, 918 (11th Cir. 2010) (district court declined to depart or vary due to the defendant's total blindness, diabetes, and kidney disease). As noted by the 6th Circuit, "prison is stressful and less than ideal medically for many people who are sent there. [The defendant] may be elderly and in poor health, but the elderly do not have a license to commit crime, and adequate medical care is available in federal prisons." *United States v. Bistline*, 720 F.3d 631, 634 (6th Cir. 2013) (internal marks and citation omitted).

Therefore, any burden on the defendant, due to his medical condition, is not abnormal, nor

5

extraordinary, as compared to other defendants, and as such, the defendant has failed to meet his burden to establish his eligibility for a departure pursuant to section 5H1.4.

### B. A variance is neither required, nor warranted, based upon the 10 to 1 sentencing disparity between "ice" and methamphetamine.

While the Court is permitted, but *not* required to grant a variance based on policy disagreements, such a variance would improperly ignore the defendant's role in the distribution of methamphetamine and fentanyl.

In *Kimbrough v. United States*, the Supreme Court upheld a variance based on policy considerations, and in consideration of the objectives of the 3553(a) factors. *Kimbrough v. United States*, 552 U.S. 85, 89 (2007) and *see United States v. Flores-Perez*, 749 Fed.App'x 793, 798 (11th Cir. 2018). *Kimbrough* granted permissive authority to district courts to grant a variance based on policy considerations, but did not mandate such a variance in every instance. *Flores-Perez*, 749 Fed.App'x at 799 and *United States v. Trejo*, 624 Fed.App'x 709, 715 (11th Cir. 2015) ("While *Kimbrough* and *Spears* "empowered" district courts to vary downward based on a policy disagreement with the applicable guidelines, they did not "command" district courts to exercise this discretion." *citing Dell v. United States*, 710 F.3d 1267, 1279 (11th Cir. 2013)). Instead, a sentence within the sentencing guidelines is expected, but not presumed to be reasonable, so long as it considers the arguments of the parties, the 3553(a) factors, and offers support for its reasoning. *Id*. at 799 and *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016).

An argument that the sentencing guidelines lack empirical support, "does not render reliance on a guideline unreasonable. Rather, it is "one factor" that a district court can consider in exercising its authority to vary from the guidelines." *Flores-Perez*, 749 Fed.App'x at 798-99. After considering the arguments of the parties and the relevant 3553(a) factors, the Court is free to impose a sentence within the sentencing guidelines without error.

Here, the sentencing factors under section 3553(a) support a sentence within the sentencing guidelines, regardless of whether the drug quantity table lacks an empirical foundation.  The defendant is not a low-level or tangential participant in the drug trade, nor a person unaware of his conduct.  Rather, he directly imported methamphetamine and fentanyl from Mexico, and profited from the purity, quantity, and type of drugs he obtained and distributed.  At the time of his arrest, the defendant possessed 111.6 grams of pure methamphetamine and 8.992.9 kilograms of fentanyl; distribution quantities of drugs that produce drastically different and powerful effects within the body, which, when taken together, suggest that these substances were not for personal use.  The statements of the occupants of the Mazda SUV, seen leaving the defendant's residence prior to his arrest confirmed his distribution activities, depicting a person engaged in the illegal distribution of narcotics, and not a mere low-level mule or courier.  Therefore, the defendant's offense conduct supports the increased penalty built into the guidelines based on substance purity, because he was aware of the purity of his product, and stood to profit from that purity.

While high-purity methamphetamine may be more common today, than at the enactment of the 1986 Anti-Drug Abuse Act, the proliferation of such a dangerous substance does not diminish its danger, nor the importance of considering that danger when fashioning a sentence that is reasonable, but not greater than necessary to achieve the goals laid out in section 3553(a).  High-potency methamphetamine remains dangerous and continues to have a profound impact, both on the end user, and indirectly, on his or her community.  It also plays an important role in the defendant's profitability, allowing him to draw customers based on the purity of his product.  The drugs at issue in this case also have a direct, demonstrable connection to Mexico, as they were tracked from their entry into the United States, from Mexico, and made the cross-country trip to the defendant's residence.

Therefore, while purity alone, may not automatically suggest a direct connection between a defendant and a methamphetamine manufacturer, the relevant facts of the case support such a connection, and a variance is not warranted based on the 10 to 1 sentencing disparity between "Ice" and methamphetamine.

### C.  The 3553a factors support a sentence of 328 months' imprisonment.

A sentence of 328 months, representing a variance from the bottom of the sentencing guidelines range, is sufficient, but not greater than necessary to ensure the objectives of 18 U.S.C. § 3553(a).

### a.  Nature and Circumstances of the Offense.

The nature and circumstances of the defendant's offense demonstrate the danger of the defendant's conduct, due to the danger of fentanyl, the effect of illegal narcotics distribution on a community, and the defendant's direct role in the distribution of fentanyl and methamphetamine.

The defendant is responsible for possessing with intent to distribute 8.992.9 kilograms of fentanyl and 111.6 grams of methamphetamine (actual).  Fentanyl is an incredibly dangerous drug, responsible for more deaths of Americans under the age of 50 than any cause of death, including heart disease, cancer, homicide, suicide, and other accidents.[1]  Of the 107,375 overdose deaths from February 2021, through January 2022, 67 percent involved synthetic opioids like fentanyl.[2] Fentanyl is a powerful drug, strong enough to kill a person with only two milligrams of the substance.[3]

Methamphetamine is also a dangerous substance, a psychostimulant with abuse potential, which is a drug category responsible for the deaths of 32,537 people in 2021.[4] "Overdose deaths

---

[1] Drug Enforcement Administration, https://www.dea.gov/fentanylawareness (May 19, 2023).
[2] Drug Enforcement Administration, https://www.dea.gov/fentanylawareness (May 19, 2023).
[3] Drug Enforcement Administration, https://www.dea.gov/fentanylawareness (May 19, 2023).
[4] National Institute of Health, https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates (July 17,

involving methamphetamine have risen in the past decade.  Many of these deaths also involve opioids, especially synthetic opioids like fentanyl, which may be knowingly consumed with methamphetamine […]."[5]

The defendant imported enormous quantities of fentanyl, enough for roughly 89,929 individual doses, and possessed a significant quantity of methamphetamine actual.  Distribution is the only conceivable use, based on the quantity of the substances, and is consistent with the statements of the individuals seen leaving the defendant's residence prior to his arrest.  They acknowledged that the defendant was known to sell fentanyl and methamphetamine, they acknowledged that they purchase both stamped pills and methamphetamine from the defendant, two or three times a week, and that they were at the residence to help the defendant unload pills from a vehicle.  The same pills tested positive for fentanyl.  Finally, they acknowledged that the defendant gets methamphetamine straight from the Mexican cartel.

The defendant was the importer, a person often cited, but rarely identified in the context of the fentanyl crisis.  He was not a street dealer, engaging in illegal conduct to support himself.  Rather, he is the source, the person who could supply all other fentanyl dealers in Highlands County for months, if not years.  The defendant is the person directly responsible for the suffering of fentanyl addicts in Highlands County, and he is responsible the collateral violence and property crime attendant to its use.

Therefore, a 328-month sentence is necessary to match the gravity of the defendant's actions:  the actions of a large-scale drug importer, capable of sourcing, preparing, and selling extremely dangerous drugs, and who ignored the consequences of his actions in the pursuit of profit.

---

2023).
[5] National Institute of Health, https://nida.nih.gov/publications/drugfacts/methamphetamine (July 17, 2023).

**b.  History and Characteristics of the Defendant and Specific Deterrence**

The defendant has a lengthy criminal history, suggesting an inability, or unwillingness, to reform his conduct, despite a multitude of opportunities and second chances.  The defendant began his criminal career in 1990, receiving a time-served sentence for possessing drug paraphernalia (PSI ¶ 28).  From there, the defendant acted as a getaway driver for a residential burglary, leading the Avon Park Police on a chase before crashing into a lake (PSI ¶ 29).  The defendant remained on probation until 1994, when he violated and had his probation revoked (id.).  Two years later, he was convicted of possession of methamphetamine with intent to sell, and sentenced to probation, only to violate two months later by committing a burglary of a dwelling (PSI ¶ 31).  The defendant was given yet another second chance, receiving a conviction for trespassing, a lesser included offense (PSI ¶ 32).  Two years later, the defendant received a conviction for possession of methamphetamine, and a separate conviction for possession of a controlled substance, and received probationary sentences in each case (PSI ¶¶ 33, 34).  The defendant promptly violated both probation, and received a 364 day jail sentence.  Finally, in 2001, the defendant was convicted in federal court of conspiracy to possess with intent to distribute methamphetamine, for his role in brokering drug transactions, with at least six people selling drugs on his behalf (PSI ¶ 36).  He was sentenced to 188 months imprisonment, followed by five years of supervised release.

For years, the defendant received second chance after second chance, despite engaging in criminal conduct that escalated in severity and violence.  Each time, he refused to reform his conduct, after receiving at least eight different opportunities, over 11 years to reform his conduct.  Yet he failed to do so.  Instead, the defendant turned to the sale of illegal drugs to support himself, despite the damaging effect those drugs would have on his customers and his community.

Therefore, by his own conduct, the defendant demonstrated that he is unwilling to follow the law.  His prior criminal history properly enhances his guideline score range, accounting for the numerous squandered opportunities, and the knowing and intentional nature of his conduct.  A sentence of 328 months is necessary to make a meaningful impression on the defendant, to end the cycle of criminal behavior, and to reform his conduct.

### c.  Promote respect for the law.

In light of the seriousness of the defendant's conduct, and his knowing importation and distribution of substances with life and death consequences, it is essential that any sentence account for the conscious, knowing choice the defendant made when he possessed methamphetamine and fentanyl with the intention to distribute these incredibly dangerous substances.

The defendant's criminal history suggests that any sentence in this case must be sufficiently serious to promote a respect for the law, acknowledging that each of the defendant's prior sentences has failed to do so.  The defendant must also account for the damage he caused to the community.[6]  As noted above, fentanyl is an incredibly dangerous substance, which can kill a person with a dose as small as two milligrams.[7]  The defendant possessed these dangerous substances with the intent to distribute them to the people in his community. This was an acceptable risk to the defendant, but one that could have easily contributed to the dire statistics of fentanyl and methamphetamine overdoses in the United States.  Therefore, a prison sentence of 328 months is sufficient, but not greater than necessary, to account for the danger of the defendant's actions, and to send a message to the community that trafficking in methamphetamine and fentanyl will not be tolerated.

---

[6] As noted previously, fentanyl is responsible for more deaths of Americans under the age of 50 than any cause of death, including heart disease, cancer, homicide, suicide, and other accidents (Drug Enforcement Administration, https://www.dea.gov/fentanylawareness (May 19, 2023)).

[7] Drug Enforcement Administration, https://www.dea.gov/resources/facts-about-fentanyl (May 19, 2023).

d. **Provide just punishment and avoid sentencing disparities.**

A 328-month sentence is also sufficient, but certainly not greater than necessary to comply with the 3553(a) factors, while providing just punishment and remaining consistent with other sentences for defendants with similar criminal histories. By way of comparison, the United States offers the following cases involving defendants convicted of drug trafficking offenses for the Court's consideration. *See United States v. Bauer et. al.*, 22-CR-14068 (S.D. Fla.) (defendant sentenced to 180 months' imprisonment (above the top of the guidelines) for possession of fentanyl with intent to distribute and possession of methamphetamine with intent to distribute; defendant was accountable for 12.53 grams of methamphetamine (actual) and 280 grams of fentanyl); *United States v. Echevarria*, 23-CR-14035 (S.D. Fla.) (defendant sentenced to 72 months (middle of the guidelines) for selling 54.34 grams of fentanyl to a confidential informant); and *United States v. Smith*, 23-CR-14038 (S.D. Fla.) (defendant sentenced to 121 months (middle of the guidelines) for selling cocaine base three times, totaling approximately 55.95 grams for all three transactions, and being found in possession of approximately 1,086.4 grams of cocaine, 115.5 grams of cocaine base, a firearm, and marijuana). Therefore, based on the quantity of methamphetamine and fentanyl attributable to the defendant, a sentence of 328 months, which represents a sentence in the middle of the sentencing guidelines,[8] is consistent with the cases cited above, and avoids any undue sentencing disparities.

---

[8] Note, the United States maintains its objections to the PSI as outlined in docket entry 46, and maintains that the defendant's sentencing guideline range is 292-365 months.

## CONCLUSION

Based on the foregoing, the United States respectfully requests the Court to deny the defendant's motion for downward variance, and sentence the defendant to 328 months' imprisonment, followed by lifetime supervised release.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:   **/s/Christopher H. Hudock**
Christopher H. Hudock
Assistant United States Attorney
Florida Bar# 92454
101 South U.S. Highway 1, Suite 3100
Fort Pierce, Florida 34950
Telephone: (772) 293-0951
Email: Christopher.hudock@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 5, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by either regular U.S. mail or inter-office delivery.

**/s/Christopher H. Hudock**
Christopher H. Hudock
Assistant United States Attorney